

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MCI WORLDCOM NETWORK SERVICES, INC., | ) ) ) | |
| Plaintiff/ Counter-Defendant, | ) ) ) | |
| vs. | ) ) | No. 02 C 4394 |
| ATLAS EXCAVATING, INC., | ) ) | |
| Defendant/ Counter-Plaintiff. | ) ) ---- | |
| ATLAS EXCAVATING, INC., | ) ) | |
| Third Party Plaintiff, | ) ) | |
| vs. | ) ) | |
| COMCAST OF ILLINOIS VI, INC., f/k/a/ MEDIA ONE OF NORTHERN ILLINOIS, INC., | ) ) ) ) | |
| Third Party Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff MCI Worldcom Network Services, Inc. (MCI) brought this action against defendant Atlas Excavating, Inc. (Atlas), alleging negligence, trespass, strict statutory liability, and breach of contract, after defendant partially severed fiberoptic cables owned by plaintiff while working on a construction project involving underground excavation. Defendant filed a counterclaim, asserting that plaintiff was responsible for the accident.[1] Plaintiff now moves for summary judgment on defendant's counterclaim, and for all other claims, except the claim

---

[1] Defendant has also filed a third party complaint against Comcast, Inc., who has not filed any of the present motions before the court.

for breach of contract. Defendant moves to dismiss the breach of contract claim. For the following reasons, plaintiff's motion for summary judgment is granted for its trespass, negligence, statutory liability claims, and for defendant's counterclaim, and defendant's motion to dismiss the breach of contract claim is denied.

## BACKGROUND

The following factual background is taken from the parties' Rule 56 statements and submitted depositions.

Defendant was hired by Internet Construction (Internet) to install fiberoptic lines in Bensenville, Illinois.[2] Defendant was to install those lines by performing a directional bore, which basically involves using directional drilling machinery to push a drill head with lengths of pipe along an underground excavation path in order to create a small conduit. The contract between defendant and Internet required that defendant take various precautions while in the proximity of existing underground utilities so as to protect those utilities from damage. The contract also provided defendant with site maps that revealed the locations of underground utilities in the area, including plaintiff's fiberoptic cable (cable), which ran to the north of Grand Avenue. XO Communications supplied the specifications represented in the site maps. Prior to drilling, defendant contacted J.U.L.I.E. (Joint Utility Locating Information for Excavators), a service that enables excavators to provide notice of their work plans to owners and operators of underground utilities. Alan Brady, employed by plaintiff, learned of the planned excavation via J.U.L.I.E., visited the site of the planned excavation, and placed flags and orange paint over the location of plaintiff's cable (Brady dep. at 14-16).

---

[2]The title of the project, "Proposed Fiber Optic Conduit Installation, Grand and Church to York and Belmont, Elmhurst-Bensenville, Illinois," accurately describes the complete path of defendant's planned excavation.

Those markings never indicated the depth of the cable (*id.* at 36). Brady did not paint over Entry Drive, a street that runs perpendicular to Grand Avenue. Instead, he placed orange flags on the east and west curbs bounding Entry Drive (*id.* at 35). The flag on the east side was farther north of Grand Avenue than the flag on the west side, which indicated that the cable angled to northeast as it passed under Entry Drive.

Before defendant began boring, it hired Atlas Daylighting to "pothole" the utility lines around the area of defendant's planned excavation. "Potholing" involves digging around a utility line in order to expose its location and depth. Defendant found plaintiff's markings to be accurate at every location where Atlas Daylighting potholed (Dillon dep. at 37). Atlas Daylighting did not pothole in Entry Drive, but did pothole on the east curb and located the cable. Defendant encountered no problems prior to the bore reaching Entry Drive. Because the drill head is underground, its location must be tracked with a locating device called a "sond" (Kinsler, dep. at 60-61). Burton Anthony Kinsler, the project's foreman, monitored the location of the bore approximately every 10 feet (Kinsler dep. at 34). However, when the bore was under Entry Drive, Kinsler intermittently lost the signal from the bore's head, possibly due to interference from traffic signals (Kinsler dep. at 107-109, 111; Dillon dep. at 56-57). Kinsler recognized that the bore would cross the cable due to the fact that the plaintiff's marking on the east side of Entry Drive was located farther north than the marking on the west side of the street. Kinsler was not worried about striking defendant's cable because he believed the bore to be at a depth below the cable. According to Kinsler, Joe Wirtz, the project manager, instructed him to bore through to the other side, despite the fact that signals from the drill were intermittent at best (Kinsler dep. at 110-12; Wirtz dep. at 69). But the bore did not make it to the other side because it struck plaintiff's cable under the

northbound lane of Entry Drive. Excavation was immediately stopped and investigation of the accident soon began. Defendant's representatives, and those from AT&T, who owned the conduit through which defendant's cable ran, arrived at the scene. Kinsler recalled how the actual location of the accident was at least five feet south of defendant's marking on the east side of Entry Drive, which suggested to him that plaintiff mismarked the location of its cable.

Plaintiff asserts that the markings were accurate and that defendant could have avoided crossing the cable by boring to the north. Defendant claims that it could not bore to the north without exceeding its right-of-way, and also that it could not verify the depth of the cable because it was prohibited from potholing in Entry Drive. Plaintiff contends that defendant's support for those two positions is inadmissible for a number of reasons and should not be considered for this summary judgment motion. With respect to the motion to dismiss, defendant argues that plaintiff's breach of contract claim must be dismissed because plaintiff was neither a party nor an intended beneficiary to the contract it entered into with Internet.

## DISCUSSION

### Plaintiff's Motion for Partial Summary Judgment

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed R.Civ.P. 56(c). We do not make credibility determinations or weigh evidence when ruling on a summary judgment motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Indeed, it is error to make credibility determinations at the summary-judgment stage. Morfin v. City of E. Chicago, 349 F.3d 989, 999 (7th Cir. 2003). Our only task is to "decide, based on the evidence of record, whether there is any material dispute of fact that

requires a trial." <u>Waldridge v. American Hoechst Corp.</u>, 24 F.3d 918, 920 (7th Cir. 1994).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party

for a jury to return a verdict for that party." <u>Anderson</u>, 477 U.S. at 249. We will grant a

summary judgment motion when the evidence in the record shows that no dispute exists, or

that the evidence brought by the nonmoving party is not sufficiently probative because it is

only colorable, as opposed to material. *Id.* at 249-50; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,

322-23 (1986). We review the evidence in the light most favorable to defendant, the

nonmoving party. <u>Payne v. Pauley</u>, 337 F.3d 767, 770 (7th Cir 2003).

The Illinois Underground Utility Facilities Damage Prevention Act (220 ILCS 50/1-14)

(the Act) sets forth procedures for construction projects involving underground excavation,

imposes duties on owners or operators of underground facilities[3] and on those who engage in

excavation and demolition, and establishes penalties for those who violate those duties.

Section 50/4 contains the steps that an excavator must follow prior to and during an excavation

project. Under that section an excavator must identify any underground utility facilities in the

planned excavation area; mark the planned excavation area with white paint or white flags;

plan the excavation so that interference with the existing facilities is minimized when

excavating within the "tolerance zone"[4] of the facilities; and take precautions including "hand

excavation, vacuum excavation methods, and visual[ ] inspect[ion]" of excavation within the

---

[3] Section 50/2.2 defines "underground utility facilities" or "facilities" to include "wires, ducts, fiber optic cable, conduits, pipes and cables and their connected appurtenances installed beneath the surface of the ground."

[4] Section 50/2.7 defines "tolerance zone" to mean "the approximate location of underground utility facilities . . . defined as a strip of land at least 3 feet wide, but not wider than the width of the underground facility . . . plus 1½ feet on either side of such facility based upon the markings made by the owner or operator of the facility." This section also cautions that "[e]xcavation within the tolerance zone requires extra care and precaution including, but not limited to" the procedures set forth in section 50/4.

tolerance zone. The excavator must also provide notice to owners and operators of underground utility facilities in the area, which is accomplished by contacting a one-call notice system, such as J.U.L.I.E.

Section 50/10 requires owners and operators of underground utility facilities who receive notice of a planned excavation near their facilities to mark "the approximate locations of such facilities so as to enable the person excavating or demolishing to establish the location of the underground utility facilities." Section 50/2.8 defines "approximate location" as "a strip of land at least 3 feet wide, but not wider than the width of the underground facility ... plus 1.5 feet on either side of the facility."

Section 50/11 provides that an excavator is liable for damage caused to owners and operators of underground utility facilities in several scenarios, including if he wilfully fails to provide notice of the planned excavation; if he provided notice but otherwise failed to comply with the act; or if he provided notice, acted reasonably, but still damaged a properly marked underground utility facility. Section 50/11 also stipulates that excavators pay penalties in either of the first two scenarios. Owners and operators are subject to penalties if they "wilfully fail to comply with [the] Act by a failure to mark the location of an underground utility."

These provisions are vital to the dispute between the parties. Citing section 50/10, plaintiff contends that defendant is statutorily liable for damaging its cable. The Act also provides procedures that must be followed and standards that must be met by excavators and those who own or operate underground utility facilities. The Act establishes that parties who fail to satisfy those procedures and standards are liable for damages, penalties, or both damages and penalties. Thus, the Act sets forth plaintiff's and defendant's duties, and also specifies the consequences for their failure to satisfy those duties.

Plaintiff advances three claims against defendant: trespass, negligence, and strict statutory liability. According to plaintiff, the common theme that binds each of those claims can be reduced to the following sequence of events: plaintiff properly marked the location of its cable; defendant knew it would cross the cable if it did not alter the path of its bore; defendant did not alter the path of its bore; defendant did not determine the exact location of the cable; and defendant struck the cable. Defendant bases its primary defense (and its counterclaim) on its position that plaintiff mismarked the location of the cables, which, according to defendant, was the true cause of the accident. Defendant asserts that mismarking is a question of fact that cannot be resolved on a summary judgment motion. In response to plaintiff's version of events, defendant contends that it could not bore to the north of the cable due to the confines of its right-of-way and that it did not expose the cable because it was not allowed to pothole in Entry Drive. In support of those contentions, defendant has offered the affidavits of several witnesses. Plaintiff raises a number of grounds for striking portions of those affidavits. We must first resolve the proper scope of the evidence prior to determining if that evidence warrants summary judgment.

Rule 56(e) requires that affidavits submitted in summary judgment proceedings must be "made on personal knowledge, shall set forth such facts that would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." An affidavit that fails on any of those grounds may be stricken. Cooper-Schut v. Visteon Auto. Sys., 361 F.3d 421, 429 (7th Cir. 2004) ("A court must not consider parts of an affidavit that fail to meet the standards of Rule 56(e) when considering summary judgment."). Additionally, an affidavit that conflicts with deposition testimony may be "disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the

question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir. 1995). Contradictory affidavits may be ignored because they fail to create genuine issues of material fact. Kalis v. Clogate-Palmolive Co., 231 F.3d 1049, 1055 (7th Cir. 2000). An affidavit contradicts a deposition when the witness adds details, fills in gaps, or provides specific descriptions when the witness, in his prior sworn testimony, disclaimed knowledge of the subject matter at issue. In such a situation the affidavit does not clarify the prior statement but instead supplements and attempts to replace it. *See id.* at 1055-56. It is "well-established" for courts to disregard affidavits that so function. *Id.* at 1056.

Plaintiff seeks to strike portions of affidavits submitted by Terrance Patrick Dillon, who owns defendant, and Kinsler and Joe Minks, who worked for defendant on the excavation project. On the issue of whether defendant was prohibited from potholing in Entry Drive, plaintiff targets sections of the affidavits submitted by Dillon and Minks. Both Dillon and Minks state that defendant was not permitted to pothole in Entry Drive (Dillon aff. at ¶ 8; Minks aff. at ¶ 3), but neither witness discloses details of that prohibition. Plaintiff posits that these conclusory statements are inadmissible under Rule 56(e). Absent from the affidavits are any specific facts that support the conclusions expressed therein. A project of this scope involves a number of regulations, work orders, and permits that instructed defendant on how to carry out the project. Indeed, the contract and site maps provide a detailed overview of the project. One would expect a prohibition on potholing in Entry Drive to be included in some type of permit or regulation. But defendant fails to point to any source, or even suggest the existence of any facts to support and substantiate its position. *See* Drake v. Minnesota Mining & Manufacturing Co., 134 F.3d 878, 887 (7th Cir. 1998) (quoting Hadley v. County of DuPage,

715 F.2d 1238, 1243 (7th Cir. 1983)) ("'Rule 56 demands something more than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

Defendant need not provide extensive factual support, but rather enough to show the existence of material facts, and that showing must be, pursuant to Rule 56(e), based on admissible evidence. In his deposition Dillon stated that he believed potholing in Entry Drive was not permitted only because he was told as much by Minks and Kinsler (Dillon dep. at 56).[5] That is hearsay and is inadmissible at summary judgment, just as it is at trial. Further, Dillon said that he did not know the source of Minks's and Dillon's statements. Defendant asserts that personal knowledge of hearsay does away with the personal knowledge requirement. But personal knowledge that a hearsay statement was made does not cure the inherent unreliability of the hearsay statement. Further, in his deposition Kinsler acknowledged that what he knew of potholing in Entry Drive was based entirely on hearsay. When asked if he ever attempted to expose the cables in Entry Drive, Kinsler responded: "Yes. We—I believe we were not allowed to pothole in the street for one thing. I can't remember where that information came from, whether it came from Joe Wirtz and he contacted the city or it was in the permits or where it came from. But I vaguely recall that we were not allowed to do any cutting of asphalt or concrete in the street" (Kinsler dep. 102-03). Tracking the source of Dillon's knowledge as far as the depositions take us, reveals Dillon's assertion is actually double-hearsay. The affidavits do not contradict the deposition testimony, but are instead consistent with it both in conclusion and in lack of substantiating facts. Defendant also contends that the affidavits

---

[5] Notably absent from Kinsler's affidavit is any mention of a prohibition on potholing in Entry Drive.

should not be stricken because the affiants swore the information they provided was within their personal knowledge. But it is the specific facts within the affidavit, and not the boilerplate language preceding the testimony, that evidences personal knowledge. The affidavits of Minks and Dillon exhibit a lack of personal knowledge, and scrutiny of Dillon's position reveals that it is based on inadmissible hearsay (which in turn is based on hearsay). Accordingly, those affidavits, in relevant part, are disregarded.[6]

Kinsler and Dillon also state in their affidavits that defendant could not bore to the north of the cable because to do so would have gone outside a right-of-way. Aside from the affidavits, defendants are silent with respect to a right-of-way. One would expect mention, in the very least, of the dimensions of the right-of-way, but, as plaintiff correctly observes, Kinsler and Dillon could not provide that information (Kinsler dep. at 101-102; Dillon dep. at 36-37). Kinsler and Dillon are both vague about the dimensions of the right-of-way in their depositions, but in their affidavits they are confident that they could not avoid crossing plaintiff's cable due to the confines of the right-of-way. The affidavits cannot be used to supplement the deposition testimony in this manner in order to create a genuine issue of material fact. Russell, 51 F.3d at 67-68. Dillon and Kinsler fail to produce specific facts to substantiate their personal knowledge of a right-of-way, and their affidavits on that subject are disregarded. In disregarding those affidavits, we also ignore the additional facts defendant provides in its Rule 56.1(b) statement of additional facts that rely on those affidavits (see, e.g., ¶ 17 of defendant's statement of additional facts). But even if we were to consider those

---

[6] Defendant seeks to supplement its response to plaintiff's motion for summary judgment with the affidavit of Fran Kinsler, who worked for Atlas Daylighting and potholed the jobsite along Grand Avenue. But we disregard his affidavit to the extent that it fails to disclose any substantiating facts to his conclusion that defendant was prohibited from potholing. By doing so we obviate the need to rule on defendant's motion to supplement its response with Fran Kinsler's affidavit.

affidavits, defendant's contentions regarding potholing and the right-of-way would not help defendant survive plaintiff's summary judgment motion. That testimony, along with defendant's claim that plaintiff mismarked the location of its cable, is not material.

The issue of mismarking, which defendant emphasizes throughout its arguments, is immaterial because defendant knew it was going to cross plaintiff's cable (Dillon dep. at 53; Wirtz dep. at 81, "If you line up how the bore path was going, and even if you lined up from curb to curb, if you line those up, they crossed."). Defendant admitted that it recognized plaintiff's cable angled, and did not run parallel to Grand Avenue when it crossed under Entry Drive (Dillon dep. at 40; Kinsler dep. at 101 "According to the locate marks from the phone company, they showed the fiber optic coming across at an angle instead of going straight across the intersection. So that gave us the indication that we would be crossing in the intersection instead of staying running alongside like we had been for the rest of the time on the job."). Yet, despite that knowledge, defendant failed to act reasonably by not ascertaining the exact location – especially the depth – of the cable before attempting to cross it. Even if defendant was prohibited from potholing in the street, it admits that potholing is not the only way to determine the location of an underground utility. Section 3.04 of the contract between defendant and Internet required defendant "to determine the exact location and elevation of all existing facilities." Similarly, even if a right-of-way confined defendant's bore path, such a restriction would not extinguish its duty to act reasonably and with due care to protect existing underground utilities. Defendant could have contacted J.U.L.I.E. or even called plaintiff directly and requested assistance in locating the cable (Wirtz dep. at 96-97; Dillon

dep. at 53-54).[7] Instead of requesting assistance, defendant assumed that its bore was deep enough to cross under the cable (Kinsler dep. at 107). But that assumption was unreasonable on two grounds. First, Kinsler testified that he lost contact with the bore (Kinsler dep. at 111).[8] Second, defendant admits that utilities can change depth under streets (Wirtz dep. at 53-54; Kinsler dep. at 33; Dillon dep. at 24). It was thus unreasonable for defendant to rely on the depth of its bore prior to entering Entry Drive. Defendant essentially drilled blindly under Entry Drive, with knowledge that plaintiff's cable was somewhere in its path.

Plaintiff satisfied its statutory duty to provide the approximate location of its cable by noting its horizontal location, and it was not required to indicate the depth of its cable with vertical location markings. Northern Illinois Gas Co. v. R.W. Dunteman Co., 301 Ill. App. 3d 689, 704 N.E.2d 960, 235 Ill. Dec. 387 (Ill. App. 2d 1998). *See also* Kinsler dep. at 31; Wirtz dep. at 24 (testifying that utility companies do not provide vertical measurements). Further, defendant testified that its potholes on the east and west side exposed the cables, indicating that the markings were accurate (Kinsler aff. at ¶ 4 "The potholing was accomplished by Atlas Daylighting. The MCI line was potholed on both the east and west sides of Entry Drive. The potholing revealed that the MCI markings to the east and west of Entry Drive were accurate in the areas where the potholing took place."). Even assuming that those markings were inaccurate, that alone would not create a material issue of fact because defendant knew it was going to cross plaintiff's cables, yet it failed to exercise due care and determine if its path was

---

[7] Section 3.04 of the contract also required defendant to request assistance if it encountered any markings that conflicted with its site maps.

[8] We strike Kinsler's affidavit, in which he said that he drilled deeper within Entry Drive, as it contradicts his deposition testimony. In his affidavit Kinsler asserts that defendant "did in fact drill deeper within Entry Drive" (¶ 6). But in his deposition Kinsler admitted that he could not obtain an accurate depth of the bore (p. 129).

sufficiently deep to not strike the cable. *See* <u>Dunteman</u>, 704 N.E.2d at 963 (affirming summary judgment for utility owner and noting that "[t]he facilities were marked and defendant was aware that other precautions, such as hand digging, should occur to prevent ruptures of the utility facilities.").

Mismarking could be an issue of material fact if plaintiff's marking on the east side of the street indicated that the cable ran parallel to Grand Avenue instead of angling away from that street. In that scenario, defendant would have a much stronger case for plaintiff being responsible for causing the accident, because defendant would not have anticipated crossing the cable. But defendant did know it was going to cross the cable. It is irrelevant that defendant crossed the cable in the northbound lane of Entry Drive, when it anticipated crossing it closer to the curb on the west side of the street. Defendant does not dispute that it lost contact with its drill, and only received intermittent signals disclosing its location. Neither can defendant dispute that it failed to determine the depth of the cable. Defendant also admits that cables often change depth under streets, and that the potholes on the west and east curbs exposed the cable. These facts are undisputed and there are no lingering credibility issues to be resolved. Together, these facts indicate that defendant failed to act reasonably under the circumstances and that it was responsible for striking plaintiff's cable. Resolution of plaintiff's claims is now a straightforward process.

"To recover in a negligence action, a plaintiff must allege facts from which a court will find a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by the breach." <u>Abrams v. City of Chicago</u>, 211 Ill.2d 251, 811 N.E.2d 670, 674, 285 Ill. Dec. 183 (Ill. 2004). Defendant had a duty to act reasonably and attempt to locate plaintiff's buried cable. <u>Illinois Bell Telephone v. Highland Park</u>, 214 Ill. App. 3d 15, 572

N.E.2d 1267, 1275, 157 Ill. Dec. 803 (Ill. App. 2d 1991). <u>Highland Park</u> identifies the

reasonableness of an excavator's conduct as material to the duty element of negligence. *See*

<u>Anderson</u>, 249 U.S. at 248 (substantive law identifies which facts are material). In <u>Highland</u>

<u>Park</u> the defendant excavators struck plaintiff's buried utility line and were found negligent

by the trial court. The appellate court vacated the lower court's finding of negligence and

instructed the lower court to determine if defendant's conduct was reasonable. *Id.* at 1275.

Defendant relies on this case, but it is distinguishable. The excavators in <u>Highland Park</u> made

extensive use of exposing and probing techniques in attempts to locate plaintiff's utility

facilities. *Id.* at 1271. Also, they did not know the duct that they struck even existed. *Id.* at

1274. In contrast, defendant failed to take reasonable steps to ascertain the location of the

plaintiff's cable, and it knew that plaintiff's cable existed. We impose no additional burdens

that do not already exist in section 50/4 and in widely-accepted industry practices. Here

defendant's attempt to locate plaintiff's cable was unreasonable. Instead of taking precautions

when preparing to cross plaintiff's cable, it proceeded full-steam-ahead without knowing the

precise location of its bore, nor the exact location of the cable. Defendant thus breached the

duty it owed to plaintiff. Defendant's failure to exercise due care within the tolerance zone

also caused the accident. The alleged mismarking was not an intervening cause for the reasons

discussed above that explain the immateriality of plaintiff's markings. There is no dispute

that plaintiff has suffered damages. Having shown all the elements of negligence to exist and

the absence of any dispute over material facts, plaintiff is entitled to summary judgment on

its negligence claim.

Trespass involves an invasion of a legally-protected interest. Owners or operators of

underground utility facilities are entitled to bring actions for trespass when excavators intrude

on their utility facilities. *See* <u>Illinois Bell Telephone Co. v. Chas. Ind Co.</u>, 3 Ill. App. 2d 258,

121 N.E.2d 600, 609 (Ill. App. 2d 1954). Liability for trespass arises if that intrusion is caused

by intentional conduct, negligent conduct, or conduct that is ultrahazardous. <u>Dial v. O'Fallon</u>,

81 Ill.2d 548, 411 N.E.2d 217, 220, 44 Ill. Dec. 248 (Ill. 1980). Plaintiff's complaint indicates

that its theory is based on defendant's negligent conduct.[9] Liability for reckless or negligent

trespass requires the defendant to cause harm to plaintiff's legally-protected interest, as

opposed to liability for intentional trespass, which exists even if the intrusion causes no harm.

*Id.* There is no dispute that plaintiff had a legally-protected interest in its cable and did not

grant defendant permission to invade that interest. No dispute exists as to the fact that

defendant's intrusion caused defendant actual harm. Due to defendant's negligent conduct

when it attempted to cross plaintiff's cable, the partial severing of that cable constituted a

trespass. Defendant argues that there was no trespass under <u>Highland Park</u>, in which the

court concluded that no trespass occurred when the defendant damaged the plaintiff's

underground cable. The court noted that it could not "read <u>Ind</u> as standing for the

proposition that an unintentional intrusion is a trespass, in light of our supreme court's

requirement of intent or negligence, unless the intrusion is caused by an ultrahazardous

activity." <u>Highland Park</u>, 572 N.E.2d at 1276. As discussed above, the court also reversed the

lower court's conclusion that the defendant was negligent for striking plaintiff's cable.

<u>Highland Park</u> does not preclude a finding of trespass because here we have found defendant

negligent.

---

[9] Paragraph 35 from plaintiff's trespass claim in its first amended complaint reads that defendant "knew, or should have known, that its actions created a high probability of serious damage to MCI's cable. [It], nevertheless, recklessly disregarded this danger and MCI's safety." This language is identical to language found in paragraph 38 of plaintiff's negligence claim.

Turning to plaintiff's claim for strict statutory liability, it asserts that under section 50/11 of the Act, defendant is liable for the damages it caused. Plaintiff fails to cite a specific provision of that section and instead asserts that defendant is liable, regardless of whether it acted reasonably. As discussed above, section 50/11 establishes both liability and penalties for excavators who damage underground utility facilities. While the penalties vary according to the nature of the excavator's conduct, the excavator is liable if it failed to provide notice (section 50/11(a)), wilfully failed to comply with the Act (section 50/11(b)), or acted reasonably, yet still damaged the underground facility (section 50/11(c)). Plaintiff is thus correct that an excavator is responsible for damages even if it acted reasonably. But we have already determined that defendant did not act reasonably, and accordingly do not consider section 50/11(c). Defendant wilfully violated the Act when it failed to "take reasonable action to inform [itself] of the location of any underground utility facilities" (section 50/4(a)) and failed to "plan the excavation or demolition to avoid or minimize interference with underground utility facilities . . . within the tolerance zone" (section 50/4(b)).[10] Defendant acted wilfully because it knew that it was going to cross plaintiff's cable, but it did not know the depth and precise position of the bore, nor did it know the exact depth and location of the cable, yet it still continued to bore. *See* 720 ILCS 5/4-5 ("Conduct performed knowingly or with knowledge is performed wilfully, within the meaning of a statute using the latter term, unless the statute clearly requires another meaning."). Defendant is thus liable under the Act.

In its counterclaim, defendant alleges that it suffered damages from plaintiff's alleged

---

[10]*See also* section 50/9:

When it is shown by competent evidence in any action for damages to underground utility facilities . . . that such damages resulted from excavation or demolition and that the person engaged in such excavation or demolition failed to comply with the provisions of this Act, that person shall be deemed prima facie guilty of negligence.

failure to properly mark the location of its cable.  The immateriality of plaintiff's markings in this factual setting has already been discussed at length.  Noting the differences in a case defendant relies on further illustrates why its counterclaim must be dismissed.  In <u>Southern Bell Telephone & Telegraph Co. v. Cherokee, Inc.</u>, 375 S.E.2d 347 (S.C. Ct. App. 1988), the utility owner instructed the contractor that its cable was buried at 30 inches, when in reality it was buried at 18 inches.  Relying on that information, the contractor struck the cable.  The utility owner sued for negligence and trespass, and the court held it to be contributorily negligent for providing inaccurate information about the location of its cable.  <u>Southern Bell Telephone</u> is thus distinguishable because in that case the contractor reasonably believed he would not strike the cable, whereas defendant here knew it was going to cross the cable and did not know the depth of the bore or the cable.  Plaintiff is therefore entitled to summary judgment on defendant's counterclaim.

It bears emphasis that absent from this case are outstanding credibility issues.  This case does not involve a swearing contest that summary judgment should not be used to resolve.  <u>Jackson v. Duckworth</u>, 955 F.2d 21, 22 (7th Cir. 1992).  Further, any factual disputes concern colorable rather than material facts and do not prevent entry of summary judgment.  All the material facts swing in plaintiff's favor.  *See* <u>Anderson</u>, 477 U.S. at 247-48 (The summary judgment "standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").  Yet, even though plaintiff may recover under multiple theories, it is only "eligible for one recovery for [its] injury" with respect to compensatory damages.  <u>Dial</u>, 411 N.E.2d at 222.

<u>Defendant's Motion to Dismiss</u>

In its fourth claim plaintiff alleges breach of contract and seeks to recover as a third party beneficiary to the contract that defendant entered into with Internet. Defendant argues that plaintiff can prove no set of facts that would allow it to recover under the contract, and that its breach of contract claim must accordingly be dismissed under Federal Rule of Civil Procedure 12(b)(6). Under that rule a claim must be dismissed only if it appears beyond a doubt that there exist no facts to support the allegations. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Plaintiff need not prove its third party beneficiary status at this stage; it need only allege a set of facts that would entitled it to relief. Plaintiff's pleadings have made the requisite showing, and defendant's motion is denied.

In ruling on this motion, all factual allegations are accepted as true, and all reasonable inferences are drawn in plaintiff's favor. Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1428 (7th Cir. 1996). Because a motion to dismiss brought under Rule 12(b)(6) tests the sufficiency of the complaint rather than the merits of the case (General Electric Capital Corp v. Lease Resolution Corp., 128 F.3d 1074, 1080 (7th Cir. 1997)), matters outside the pleadings are generally not considered. Thompson v. Illinois Dep't Prof'l Regulation, 300 F.3d 750, 753 (7th Cir. 2002). However, we may consider documents not included in the pleadings if they are central to plaintiff's claim and are referred to in its complaint. 188 LLC v. Trinity Indus. Inc., 300 F.3d 730, 735 (7th Cir. 2002). The contract between Internet and defendant – central to plaintiff's claim and referred to in its complaint – is not contested as inauthentic, and is thus properly before the court on this motion.

Third party beneficiary status exists when the contracting parties express an intent to benefit another party, as evidenced by the language of the contract. Quinn v. McGraw-Hill Cos., 168 F.3d 331, 334 (7th Cir. 1999) (quoting XL Disposal Corp. v. John Sexton Contractors

Co., 168 Ill.2d 355, 659 N.E.2d 1312, 1316, 213 Ill. Dec. 665 (Ill. 1995)).  When "determining

third-party beneficiary status, the contract is controlling." Ball Corp. v. Bohlin Bldg. Corp.,

187 Ill. App. 3d 175, 543 N.E.2d 106, 108, 134 Ill. Dec. 823 (Ill. App. 1st Dist. 1983).    Any

benefits a third party receives must flow directly, rather than incidentally, from the contract,

if that party is to recover under the contract.  American United Logistics, Inc. v. Catellus Dev.

Corp., 319 F.3d 921, 930 (7th Cir. 2003).   There is a strong presumption that the contracting

parties "intend contract provisions to apply only to themselves." Ahern v. Board of Educ., 133

F.3d 975, 983 (7th Cir. 1998) (citing Harbor Drive Condominium Assoc. v. Harbor Point Inc.,

209 Ill. App. 3d 631, 568 N.E.2d 365, 375, 154 Ill. Dec. 365 (Ill. App. 1st Dist. 1991)).   Despite

that presumption, the contract need not name specific third parties, provided that it defines

a class of beneficiaries.  B.C. v. J.C. Penny Co., 205 Ill. App. 3d 5, 562 N.E.2d 533, 539, 150 Ill.

Dec. 3 (Ill. App. 1st Dist. 1990).

        The contract incorporated various standards that the parties refer to as the "XO

Standards." Those standards establish the procedures Atlas was required to follow, and they

also include site maps and plans for the excavation project. Those maps indicate the existing

underground utilities, as well as the various business establishments, streets and structures in

the area.   Plaintiff's claim relies heavily on specific provisions from the XO Standards.

Plaintiff first highlights section 3.01, which required that "[d]ue caution and hand-digging will

be exercised in close proximity to indicated underground utilities." Next, plaintiff points to

section 3.04, which states in sum:

> The plans show the locations of water mains, gas mains, communication lines,
> electric lines, sewers, and other utility lines according to information available
> in the field and in records.  This information is not deemed to be complete.  It
> is the express responsibility of the Contractor to determine the exact location
> and elevation of all existing facilities, pipes, and lines, and to provide for their

        proper protection, support and maintenance prior to all construction operations. Whenever existing utility lines of any nature are encountered which conflict in location or elevation with proposed construction, the Contractor shall notify the Engineer who will provide any engineering required to avoid the conflict.

Section 5.05 states that "[t]he Contractor is to restore all damaged structures and utilities to the satisfaction of the owners representative." Finally, appearing on twelve separate pages of maps in the XO standards is the following requirement: "Contractor is to 'test hole' each utility. Determine size, location, and depth prior to crossing." Plaintiff contends that these provisions, along with the fact that the maps specifically identify its cable, indicate that it is a third party beneficiary to the contract because they obligate defendant to safeguard existing utility lines. Plaintiff further asserts that defendant breached the contract by failing to comply with the cited provisions.

        Defendant finds no provision in the contract that expresses an intent to benefit plaintiff, which, according to defendant, precludes third party beneficiary status. Defendant believes the references to plaintiff's cable "simply identify" it, and do not indicate an intent to benefit plaintiff. In response, plaintiff advances that section 3.05 is analogous to provisions found to evidence third party beneficiary status in In re Chicago Flood Litig., 1993 U.S. Dist. LEXIS 8754; 1993 WL 239041 (1993), and Baker v. S.A. Healy, 302 Ill. App. 634, 24 N.E.2d 228, (1939). In Chicago Flood, the court found the following provision to indicate third party beneficiary status: "The contractor shall avoid damage, as a result of his operations, to . . . adjoining property and the property of the City and others and he shall at his own expense repair any damage thereto caused by his operations." 1993 U.S. Dist. LEXIS 8754, *28-29. In Baker, the court determined that the following contractual provision expressed an intent

to benefit third parties: "'The contractor shall at his own expense repair any damage to . . . buildings or other property of the Sanitary District or other owners.'" 302 Ill. App. 634, 655. The provision in the contract between defendant and Internet is strikingly similar to those in Chicago Flood and Baker, to the extent that it conveys an intent to benefit parties damaged by the contractor. Indeed, the intent to benefit third parties is more definite in section 3.05 due to the requirement that the contract must repair damaged utilities "to the satisfaction of the owners representative." Defendant's attempt to distinguish Chicago Flood and Baker is unconvincing. Defendant cites Alaniz v. Schal Associates, 175 Ill. App. 3d 310, 529 N.E.2d 832 (Ill. App. 2d Dist. 1988); however, that case distinguishes Baker, which involved a promise by the contractor to repair any damage it caused, and section 3.05 includes the same type of promise to repair and restore.

Defendant argues that section 3.05 is an "incidental provision," and is not for the purpose of creating the contract. But that provision is nevertheless included in the contract, and the intent to benefit a damaged utility line is apparent on its face. Defendant further contends that this provision fails to establish third party beneficiary status because neither it nor Internet intended to damage utilities. It also argues that it promised to render performance to Internet, and not to plaintiff or any other party. These arguments are unavailing. Section 3.05 evidences an intent to benefit utilities damaged during the project. Plaintiff is an "indicated underground utility" because the maps, as defendant admits, identify its cable. The initial intent to benefit the parties is not diminished by the fact that a subsequent event, *i.e.*, damage to the utility, must occur before defendant's obligation to repair is triggered. By having to repair damaged utilities "to the satisfaction of the owners

representative," defendant must confer a benefit on the owner of the damaged utility, which in this case, is plaintiff. Similarly, the provisions requiring defendant to exercise due care, locate and protect existing utility lines, request help if the provided maps were inaccurate, and to determine the size, location and depth of each utility line prior to crossing, all benefit plaintiff by establishing procedures meant to protect its utilities. These precautionary and remedial benefits plaintiff was to receive were not incidental to the contract, but instead flow directly from the contract provisions, and plaintiff has thus adequately alleged a right to recover under the contract. *See* Carson Pirie Scott & Co. v. Parrett, 346 Ill. 252, 178 N.E. 498, 501 (Ill. 1931).

Whether or not plaintiff is actually a third party beneficiary to the contract is an issue for another day. Plaintiff has pled facts that, if true, would entitle it to relief, and that is sufficient to survive defendant's motion, which is dismissed.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for partial summary judgment is granted for its trespass, negligence, and statutory liability claims. We also grant summary judgment for plaintiff on defendant's counterclaim. Defendant's motion to dismiss is denied as to plaintiff's breach of contract claim.

JAMES B. MORAN
Senior Judge, U. S. District Court

Feb 23 , 2005.