# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MCI WORLDCOM NETWORK SERVICES, INC., | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    No. 02 C 4394 |
| | ) |
| ATLAS EXCAVATING, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff MCI WorldCom Network Services, Inc. brought this action against defendant Atlas Excavating, Inc. for injuries sustained after defendant partially severed plaintiff's underground fiberoptic cable while working on an underground excavation construction project. Plaintiff asserted claims of trespass, negligence, strict statutory liability, and breach of contract. In an order dated February 23, 2005, the court granted summary judgment in plaintiff's favor as to defendant's liability on trespass, negligence and strict statutory liability. MCI WorldCom Network Services, Inc. v. Atlas Excavating, Inc., 2005 WL 1300766 (N.D.Ill.2005) ("Atlas I"). In that same order, we denied defendant's motion to dismiss plaintiff's breach of contract claim. On September 19, 2005, we denied defendant's motion to reconsider the grant of summary judgment. MCI WorldCom Network Services, Inc. v. Atlas Excavating, Inc., 2005 WL 2338817 (N.D.Ill.2005) ("Atlas II"). Defendant now brings this partial summary judgment motion, asserting that plaintiff cannot recover loss-of-use or punitive damages. In the alternative, defendant argues that plaintiff's loss-of-use damages should not be calculated by the rental value of substitute cable and/or should be limited to

affected circuits active at the time of the accident. In the course of the briefing, plaintiff brought two motions to strike portions of defendant's statement of material facts and defendant's response to plaintiff's statement of additional facts. For the reasons stated herein, we grant plaintiff's motions to strike and deny defendant's motion for partial summary judgment.

## BACKGROUND

As we have previously noted, this case does not present difficult credibility questions to be avoided in summary judgment determinations. *See* Atlas I, 2005 WL 1300766, at *9. Although plaintiff contests certain facts regarding damages set forth in defendant's 56.1 statement of material facts as disputed or inconsistent with the law of the case, the underlying facts giving rise to plaintiff's claims are not in dispute.

The underlying dispute arose from excavation work defendant was performing for XO Communications. Defendant began work on the XO project on November 29, 2001. Prior to beginning excavation, defendant contacted J.U.L.I.E. (Joint Utility Locating Information for Excavators), a service that enables excavators to provide notice of their work plans to owners and operators of underground utilities, so owners can mark the location of the utilities. MCI then marked the location of its underground utilities.[1] From November 30, 2001 to December

---

[1]Defendant argues that plaintiff mismarked the location of its underground utilities (def's 56.1 statement, at ¶¶ 59-62, 64). Plaintiff vehemently denies such a claim and points to our earlier decisions to further argue that its position is the undeniable law of the case. In Atlas I, we held that plaintiff's alleged mismarking was immaterial to defendant's liability because defendant knew it was going to cross plaintiff's cable. 2005 WL 1300766, at *5-6. Therefore, we found that defendant's decision to drill without getting more information was unreasonable, regardless of any mismarkings. We also noted that, "[p]laintiff satisfied its statutory duty to provide the approximate location of its cable by noting its horizontal location, and it was not required to indicate the depth of its cable with vertical location markings." *Id.*, at *6. We confirmed our decision in Atlas II, stating that "the markings on the side of the street were not material to defendant's negligence because, regardless of their existence, defendant knew it would cross the cable yet it failed to identify the precise location of the cable." 2005 WL 2338817, at *1.

3, 2001, defendant performed the drilling work on the XO project. On December 4, 2002, defendant was performing a directional bore along the north side of Grand Avenue near the intersection of Grand Avenue and Entry Drive. While boring under Entry Drive, defendant struck an MCI underground fiberoptic cable. Defendant's actions failed to completely sever plaintiff's cable, and MCI identified the outage as a partial cut, but was unable to identify how many fibers were affected. Based on these facts, among others, we previously found defendant liable for trespass, negligence, and statutory liability under Illinois Underground Facilities Damage Prevention Act, 220 ILCS 50/1-50/14.[2]

We turn now to the facts underlying defendant's argument regarding the kind and amount of damages available to plaintiff. The undisputed facts regarding damages are as follows.[3] The affected MCI cable, which runs along the north side of Grand Avenue in Bensenville, Illinois, included two spans. The first span ran between MCI's terminals in Downers Grove, Illinois, and Bensenville, running approximately 12 miles. The second ran between MCI's terminals in Downers Grove and Minneapolis, Minnesota, running approximately 346 miles. The affected cable carried DS-3s, which are electrical circuits having a bit stream or data rate of approximately 44.7 megabits per second. One DS-3 is the equivalent of 672 individual phone calls. On December 4, 2001, when Atlas partially severed MCI's cable, the first span was carrying 13 local and long distance transport systems with a total capacity of 648 DS-3s. The second span had five active transport systems with a total

---

[2] For a full description of the facts underlying defendant's liability, see <u>Atlas I</u>. And, although defendant's current 56.1 statement of material facts includes additional statements regarding the underlying incident, we find them immaterial to defendant's damages argument, and therefore see no need to discuss them in detail.

[3] Plaintiff disputes some of these facts as immaterial, but does not dispute their truthfulness.

capacity of 240 DS-3s. All 19 systems, and all 888 DS-3s of capacity on those systems, were impacted by the defendant's severance of the cable.

Prior to the incident on December 4, 2001, plaintiff had installed excess restoration capacity into its network. In the form of ring protection, MCI's redundant capacity system allowed a fiber system to recover by allowing other systems to provide service as a backup recovery system when a cut impacted its system. Therefore, when an MCI system went down, the network switched that system to a redundant path that allowed service to continue on the alternate path. To do that, plaintiff utilized real time restoration ("RTR") or dynamic route generation ("DRG"), which automatically rerouted traffic affected by outages at the DS-3 level, in addition to manual patching. In response to the Atlas incident, plaintiff utilized RTR, DRG, and manual patching, to reroute customers affected by the incident. Although MCI was able to reroute most of its capacity through those methods, it received complaints from at least 18 customers that their service was interrupted as a result of the December 4, 2001, severance of the MCI cable.

In its complaint, plaintiff requested damages for actual, punitive, and loss-of-use damages. Defendant does not dispute plaintiff's actual damages at this stage, but focuses on plaintiff's request for loss-of-use and punitive damages, focusing its arguments mainly on the former. MCI has requested $643,902.50 in loss-of-use damages. MCI based its loss-of-use calculations on the cost of obtaining similar substitute or replacement property for the 19 transport systems lit, active, and impacted by Atlas' actions. Defendant contests both plaintiff's ability to get loss-of-use damages and, in the alternative, the means by which plaintiff calculated such damages.

## DISCUSSION

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See also* Wainwright Bank & Trust Co. v. Railroadmen's Fed. Sav. & Loan Ass'n of Indianapolis, 806 F.2d 146, 149 (7th Cir.1986). The moving party has the burden to establish the lack of a genuine issue of material fact. *Id.* Upon meeting that burden, the non-moving party must set forth specific facts which demonstrate the existence of a genuine issue for trial. Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.1983). The mere existence of some factual dispute will not frustrate an otherwise proper summary judgment motion; only a genuine dispute over a material fact will defeat summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).

Pursuant to Local Rule 56, we construe the facts set forth in the parties' 56.1 statements of facts in plaintiff's favor. *See* Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Bledsoe v. City of Chicago, 1996 WL 406647, *2 (N.D.Ill.1996) (stating that only reasonable inferences, not all conceivable inferences, will be drawn in favor of non-moving party). In this case, however, plaintiff has contested the admissibility, relevance, and/or consistency with the developed law of the case of certain portions of defendant's statement of material facts and response to plaintiff's statement of additional facts. As we have previously noted in this case, we must first resolve the proper scope of the evidence prior to determining if that evidence warrants summary judgment.

We first address plaintiff's motion to strike certain paragraphs in defendant's 56.1 statement of facts. Specifically, plaintiff moves to strike paragraphs 16, 18, 21, 27, 30-32, 42,

55, 57-62, 64, 65, 67, 76-80, 83-85, and 88-90. In response, defendant addressed paragraphs 16, 18, 21, 30-32, 42, 76-80, 83-85, and 88-90. Because defendant failed to contest plaintiff's motion to strike paragraphs 27, 55, 57-62, 64, 65, and 67, plaintiff argues that such facts must be struck as conceded. The general rule in the Seventh Circuit is that a party's failure to respond to an opposing party's argument implies concession. *See, e.g.*, Keri v. Board of Trustees of Purdue University, 458 F.3d 620, 643, n7 (7th Cir.2006); Drummer v. Bank, 2006 WL 2051331, *5. After a brief review of such statements of facts – all of which are identical to statements in defendant's additional facts in response to plaintiff's motion for summary judgment, which was the subject of an earlier (successful) motion to strike – we follow the general rule and strike them upon defendant's concession.

We turn now to the disputed paragraphs. Paragraphs 16, 18, and 32 deal with Tony Kinsler's bore plan and indicate that Kinsler monitored the bore head during drilling at least every ten feet. Kinsler's deposition, which is defendant's main support for these paragraphs, on the pages cited, deals with Atlas' general plans and policies for underground drilling, not specifically the XO project ("You're just talking in general still; right? Yes") ( def's statement of material facts, exh. E, at 33). Therefore, as applied specifically to the XO project, we strike paragraphs 16, 18, and 32. Paragraph 18 also states, "Atlas was required to drill within the right of way that ran along Grand Avenue." We addressed this exact issue in our order of February 23, 2005. We noted that where Kinsler's deposition indicated confusion regarding the dimensions of the right-of-way, defendant could not use Kinsler's affidavit "to supplement the deposition testimony in this manner in order to create a genuine issue of material fact." Atlas I, 2005 WL 1300766, at *5. As defendant has failed to point to any other evidence substantiating this fact, it must be stricken from the record for purposes of this summary

judgment motion.[4]

Paragraph 21 is identical to paragraph 17 of defendant's additional statement of material facts submitted in conjunction with its opposition to plaintiff's earlier summary judgment motion, and is based on affidavits and deposition testimony already discarded for this point. As it applies to the right-of-way and the depth of the digging under Entry Drive, we strike paragraph 21. We already indicated that such testimony is either not within the witness' personal knowledge or is contradicted by earlier testimony.

Paragraph 30 states that "Atlas did everything that it was told it was allowed to do which was to pothole both sides and verify the depth of the utility of each side." While such a statement is taken directly from Dillon's deposition testimony, the remainder of his testimony indicates that such may not have been within his personal knowledge. For example, Dillon's deposition testimony indicated that he believed potholing in Entry Drive was impermissible based only on his conversations with Minks and Kinsler. As we already noted, "[t]hat is hearsay and is inadmissible at summary judgment, just as it is at trial." Atlas I, 2005 WL 1300766, at *5. Therefore, as Dillon has no personal knowledge that potholing was not allowed, his statement that defendant did everything it was allowed is inadmissible, and, therefore, stricken.

Paragraph 31 states that "Atlas checked all the utilities to be sure that there was no sanitary or storm sewers or anything to hit in the intersection." As defendant was well aware

[4]Defendant contends that "[w]hile certain facts stated by Atlas on the issue of liability may not have been relevant or persuasive to the Court on liability issues, those facts are still relevant to the issue of damages" (def's resp. to plf's mo. to strike portions of def's stmt of material facts, at 2). Such an argument fails to save many of defendant's statements of material facts. While it is true that different facts may be relevant, plaintiff's arguments, as here, often focus on the admissibility of the material fact, not its relevance. Inadmissible evidence, due to hearsay, lack of personal knowledge, or inconsistent testimony, is inadmissible both for liability and for damages.

that it would cross MCI's cable under Entry Drive (*see* def's statement of material facts, exh. E., at 101), and we already determined that defendant was negligent in its drilling, defendant's paragraph 31 is struck as to its indication that Atlas was sure that it would not hit *anything* in the intersection.

Unlike the facts discussed above, those set forth in paragraphs 42, 76-80, 83-85, and 88-90 are not duplicative of defendant's earlier additional statement of material facts. Such facts relate to the loss plaintiff suffered due to defendant's misconduct. Specifically, the facts address MCI's redundant capacity, MCI's repairs and loss of revenue, and MCI's loss-of-use claim. Plaintiff argues that under Illinois law loss-of-use damages may be awarded regardless of whether MCI was forced to purchase or obtain substitute property, or was able to reroute traffic. Plaintiff claims that defendant's statements of fact are irrelevant for the determination of loss-of-use damages, and therefore must be stricken for lack of relevance. Defendant contends that "MCI is attempting to put the cart before the horse by essentially asking the Court to deny the Motion for Partial Summary Judgment without even considering the facts supporting it" (def's response to plf's motion to strike def's statement of material facts, at 4). Our determination of this motion will turn on our analysis of Illinois case law on the subject of loss-of-use damages. Either way, we must address plaintiff's contentions and make a ruling on whether defendant is entitled to partial summary judgment on damages. Therefore, we need not determine whether we are striking the facts for irrelevance or determining the motion on the merits. It is the same analysis, and we undertake it below.

Next, we address plaintiff's motion to strike portions of defendant's response to plaintiff's statement of additional facts. The paragraphs at issue deal with MCI's alleged mis-marking of its cable, Atlas' knowledge that its bore would intersect with MCI's cable, Atlas'

No. 02 C 4394                                                                 Page 9

inability to obtain an exact location or accurate depth of its bore, precautions Atlas did or did not take prior to drilling, and the reasonableness and willfulness of Atlas' actions. In support of its opposition to plaintiff's statements of fact, plaintiff relies on Kinsler's deposition and affidavit testimony, and an e-mail from Tony Hartzell. As plaintiff correctly points out, the e-mail is offered for the truth, and therefore is inadmissible hearsay. *See* Haywood v. Lucent Technologies, Inc., 323 F.3d 524, 533 (7th Cir.2003) (inadmissible hearsay is not enough to preclude summary judgment). The portions of Kinsler's affidavit upon which defendant relies have already been struck by this court with respect to the depth of the drilling and the alleged right-of-way, due to the inconsistencies with Kinsler's deposition testimony. We will not allow defendant to resuscitate them here. Nor can defendant rely on Kinsler's deposition testimony to dispute the fact that defendant knew it would cross MCI's cable line, as Kinsler admitted as much in his deposition. Nor does Kinsler's testimony evidence personal knowledge of MCI's mismarking, and therefore it is inadmissible for such a fact. In fact, we have already determined that "[p]laintiff satisfied its statutory duty to provide the approximate location of its cable by noting its horizontal location, and it was not required to indicate the depth of its cable with vertical location markings." Atlas I, 2005 WL 1300766, at *6. Finally, we have already found that Atlas acted unreasonably in its drilling and willfully violated the Illinois Underground Facilities Damage Prevention Act, 220 ILCS 50/1-14. Although these are legal conclusions, this court has already made such findings (*see* Atlas I, 2005 WL 1300766), and they are therefore treated as the law of the case. Based on defendant's use of inadmissible and contrary statements in response to plaintiff's statement of additional facts, we strike paragraphs 1-5 and 7-9.

## Loss-of-use Damages

We turn now to the merits of this motion, beginning with the question of whether plaintiff is entitled to loss-of-use damages under Illinois law. Loss-of-use damages is not a new theory of recovery. In 1881, the Supreme Court decided The Potomac, 105 U.S. 630 (1881), which held that the owner of a steamboat damaged in a collision was entitled to loss-of-use damages. Specifically, the Court stated that "[i]n order to make full compensation and indemnity for what has been lost by the collision, *restitutio in integrum*, the owners of the injured vessel are entitled to recover for the loss of her use, while laid up for repairs. When there is a market price for such use, that price is the test of the sum to be recovered." *Id.*, at 631-32. Courts, including Illinois courts, have adopted that concept, generally awarding such damages "where plaintiff has been deprived of the use of personal property." Nisbet v. Yelnick, 464 N.E.2d 781, 784 (Ill.App.Ct.1984). *See also* Wilson v. DiCosola, 815 N.E.2d 975, 978 (Ill.App.Ct.2004), Int'l Harvester Credit Corp. v. Helland, 503 N.E.2d 548, 553 (Ill.App.Ct.1986); Gent v. Collinsville Volkswagen, Inc., 451 N.E.2d 1385, 1390 (Ill.App.Ct.1983).

It is well settled that where a plaintiff rents alternative property for the length of time necessary to repair his personal property, loss-of-use damages can be assessed against defendant. In this case, however, because of its redundant capacity, plaintiff was not forced to rent alternative transport systems to cover its customer usage. Rather, MCI instantly switched the electrical currents running on the affected cable to its backup cable in a seamless transition. Apart from the approximately 18 complaints received from MCI customers, there is no evidence that plaintiff's customers were otherwise affected. Because MCI was not forced to rent alternative capacity, defendant argues that they are not entitled to loss-of-use damages.

Defendant further argues that an award of such damages would amount to an improper windfall judgment. Defendant contends that "[s]uch an award would make MCI more than whole and award it profits for this accident" (def's motion, at 2).

Plaintiff rightfully responds that Illinois courts have allowed for loss-of-use damages even where plaintiff has not rented alternative property. *See* Gent, 451 N.E.2d 1385; Fairchild v. Keene, 416 N.E.2d 748 (Ill.App.Ct.1981); McCabe v. Chicago & Northwestern Ry. Co., 215 Ill.App. 99 (Ill.App.Ct.1919). In Fairchild, the court noted: "To require the actual rental of a vehicle in order for the measure to apply would merely assure that most injured owners would do so. Those who could not afford to advance the money would be unfairly prejudiced." 416 N.E.2d at 749. Defendant aptly points out that this case does not present the same type of concerns stated in Fairchild. Therefore, we must look at this case from a broader perspective.

Based on our research and cases cited by the parties, we conclude that, as a general matter, loss-of-use cases in which plaintiff does not rent alternative property can be divided into two broad categories. The first consists of a line of cases wherein some inherent value of the affected or substitute property compels the court to find that plaintiff is entitled to loss-of-use damages. The second consists of a line of cases wherein the affected property has no unique, inherent value to plaintiff, either because it would have provided no service to plaintiff during the period of its disrepair or because the service it would have provided was completely absorbed by plaintiff's working capacity. The Supreme Court, in Brooklyn Eastern Dist. Terminal v. U.S., 287 U.S. 170, 175 (1932), a case on which defendant's cited cases rely, explained the difference:

> The doctrine of the "spare boat" cases is invoked by the petitioner as decisive in its favor, but we think without avail. Shipowners at times maintain an extra or spare boat which is kept in reserve for the purpose of being utilized as a

substitute in the contingency of damage to other vessels of the fleet. There are decisions to the effect that in such conditions the value of the use of a boat thus specially reserved may be part of the demurrage. If no such boat had been maintained, another might have been hired, and the hire charged as an expense. The result is all one whether the substitute is acquired before the event or after. The same doctrine has been recognized in the English courts, where a boat thus held in reserve is known as a standby. In those courts, however, as in our own, there has been a refusal to extend the doctrine to boats acquired and maintained for the general uses of the business.

*Id.*, at 176-77 (internal citations omitted).

The "spare boat" cases represent the first category, while the general use-of-business cases represent the latter. This differentiation has been a key to determining whether loss-of-use damages are awarded. For example, in First Chicago Gary-Wheaton Bank v. Gaughan, 655 N.E.2d 936 (Ill.App.Ct.1995), the Illinois court awarded loss-of-use damages for defendant's valuable sports car, even though the evidence indicated that defendant rarely used the vehicle for transportation. The court found that the "defendant really purchased this special car as a prize to be possessed rather than a vehicle to be driven and, as such, it had an inherent value which defendant lost when he was no longer in possession of the vehicle." *Id.*, at 942. This case can be compared to Parrillo v. Commercial Union Ins. Co., 85 F.3d 1245 (7th Cir.1986), wherein the Seventh Circuit refused to award loss-of-use damages for plaintiff's boat, where the evidence showed that the boat was in storage during the period of its disrepair, and therefore held no inherent value for plaintiff. *See also* Int'l Harvester Credit Corp., 503 N.E.2d 548 (in a replevin action, plaintiff had to introduce testimony as to how he would have used the withheld property before loss-of-use damages would be awarded).

In the telecommunications cases, where the facts are similar to the facts at hand, the same differences can be noted. For example, in MCI WorldCom Network Services, Inc. v. Kramer Tree Specialists, Inc., 2003 WL 22139791 (N.D. Ill.2003), the court specifically cited

MCI'S "emergency" infrastructure in granting loss-of-use damages. This can be compared to <u>MCI WorldCom Network Services, Inc. v. OSP Consultants, Inc.</u>, 585 S.E.2d 540 (Va. 2003) and <u>MCI WorldCom Network Services, Inc. v. W. M. Brode Co.</u>, 413 F.Supp.2d 868 (N.D. Ohio 2005), where the courts, relying on <u>Brooklyn Eastern</u>, found that MCI used its redundancy capabilities in the ordinary course of business and did not reserve it expressly for emergencies. Therefore, plaintiff was not permitted loss-of-use damages.

In light of the facts presented in this case, we conclude that plaintiff's use of the affected cable and the redundant capacity backup falls into the former line of cases, and not the latter. First, plaintiff's redundant capacity was used for emergency purposes only, and not in its general business (*see* def's 56.1 statement of facts, at ¶ 46). Therefore, it more clearly parallels the "spare boat" cases than the general use cases. Second, plaintiff's redundant capacity had inherent value of its own – a guarantee of seamless service in the event of an emergency. Defendant does not contest this. "In addition to the vital public interest in uninterrupted telecommunications services, MCI provides 'service guarantees' to many of its customers in which MCI guarantees that there is a backup route immediately available to carry their traffic if the primary cable becomes inoperable. Due to the competitive nature of the industry, even customers without 'service guarantees' would leave MCI for other carriers if MCI did not have the protect routes to immediately restore their services in the event of a cut" (plf's statement of additional facts, at ¶ 24). Like the situation in <u>Gaughan</u>, such inherent value was lost during the time that the redundant capacity was acting as a backup for the cable affected by the Atlas incident. Again, defendant fails to refute such an injury (*see id.*, at ¶ 15) ("The systems that were switched to spare, protect paths and/or dedicated restoration capacity were operating in a diminished capacity in that: (a) there was no longer an alternate or redundant

route available for those systems; (b) traffic being transported on those systems was therefore in a 'jeopardy' situation until the cable Atlas severed was repaired; and (c) had a cut occurred on the redundant route before the cable Atlas severed was repaired, traffic covered by those systems would have been completely interrupted"). In light of such undisputed evidence we find that plaintiff was injured by the loss of the use of its capacity, and therefore is entitled to loss-of-use damages.

Defendant argues that if plaintiff is entitled to recover loss-of-use damages, it is inappropriate to measure those damages by the rental value of a substitute cable. Specifically, defendant argues that the cable itself was of negligible value and therefore the proper measure would be the "rental value of the severed cable, not the theoretical value of the severed cable's capacity, as MCI claims" (def's motion, at 8) (emphasis omitted). We disagree. Illinois courts have adopted The Potomac's measure of damages for loss-of-use cases – "[t]he measure of damages in such instance is the reasonable rental value of similar property for the period of deprivation." Nisbet, 464 N.E.2d at 784. Although plaintiff should not be awarded a profit in receiving damages, the purpose of awarding compensatory damages is to make the injured party whole. J.F. Equipment, Inc. v. Owatonna Mfg. Co., Inc., 494 N.E.2d 516, 522 (Ill.App.Ct.1986). In this case, rental of a cable, uninstalled and unable to carry on plaintiff's business, would not make plaintiff whole. In that way this case differs from an automobile case where loss-of-use damages are generally awarded in the form of money for a rental car. See, e.g., McCabe, 215 Ill.App. 99. In automobile cases, awarding rental of a car makes plaintiff whole – he is granted transportation and use of an automobile. In this case, the cost of cable itself, without installation or ability to carry out plaintiff's business needs, is insufficient to make plaintiff whole. Rather, as the name suggests, it is the cost of the use of

plaintiff's property that will make plaintiff whole.  Therefore, in line with the decision in Kramer Tree I, 2003 WL 22139794 (N.D.Ill.2003) and II, 2003 WL 22139791 (N.D.Ill.2003), the only analogous telecommunications case presented applying Illinois law, we find that the reasonable rental of a substitute cable is the appropriate measure of damages.

Defendant's reliance on MCI Worldcom Network Servs. v. Lind, 2002 U.S. Dist. LEXIS 26467 (D.Fla.2002), MCI Worldcom Network Servs. v. Morris Plumbing & Elec. Co., 2002 U.S. Dist. LEXIS 26466 (D.Fla.2002), and MCI Worldcom Network Servs. v. Mastec, Inc., 2003 U.S. Dist. LEXIS 10757 (D.Fla.2003), is misplaced.  These cases relied on Florida law, stating that rental value is not the only method of determining loss of use.  In fact, the Morris Plumbing court stated explicitly that "Florida Courts of Appeal have explicitly held that 'the measure of damage is 'loss of use' not rental value'" 2002 U.S. Dist. LEXIS 26466, at *16 (citing Meakin v. Dreier, 209 So.2d 252, 254 (Fla.App.Ct.1968)). Defendant has pointed to no similar authority in Illinois, nor have we found any in our own research.  In fact, plaintiff points to several cases and legal reference material on Illinois law which indicate the opposite. See, e.g., 15 Ill. LAW & PRAC., DAMAGES, § 17 ("As a general rule, the damages recoverable for the loss of use of property are to be estimated with reference to the rental value or fair interest on the investment, and not on the uncertain and speculative basis of the profits which might have been made from its use"); Nisbet, 464 N.E.2d at 784.

Finally, defendant argues that, at the most, MCI can recover for damage to circuits that were active at the time of severance.  We agree, as does plaintiff.  As plaintiff states, and defendant does not dispute, 19 of MCI's systems, and all 888 DS-3s of capacity on those systems were impacted by Atlas' severance of the cable (plf's statement of additional facts, at ¶ 14).  Further, there is no disagreement that "MCI used only the 888 DS-3 capacity of the 19

transport systems that were lit, active and impacted when Atlas severed it, not the capacity of the entire cable, when calculating its loss-of-use damages...." (*Id.*, at ¶ 18). In summary, we find that plaintiff can recover the reasonable rental value of the active, lit circuits impacted by Atlas' actions as loss-of-use damages.

## Punitive Damages

Defendant argues that plaintiff is not entitled to punitive damages. Although Illinois courts caution against awarding punitive damages improperly or unwisely (*see, e.g.,* Proctor v. Davis, 682 N.E.2d 1203, 1216 (Ill.App.Ct.1997)), such damages "may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." Kelsay v. Motorola, Inc., 384 N.E.2d 353, 359 (Ill.1978). Punitive damages, however, should not be awarded for mere inadvertence, mistake, errors of judgment, or ordinary negligence. Tucker v. Illinois Power Co., 597 N.E.2d 220, 231 (Ill.App.Ct.1992). Rather, punitive damages "are appropriate only for conduct involving some element of outrage, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others." *Id.*

In this case, defendant argues that "[t]he evidence shows that Atlas was quite concerned with protecting MCI's property, that it took the required measures to protect those interests, and that the incident was at most simply a mistake. There is no evidence that Atlas intentionally did so or acted in a willful and wanton manner" (def's motion, at 14). We disagree, at least with defendant's first sentence. In fact, in our previous order we wrote that "defendant failed to act reasonably under the circumstances and that it was responsible for striking plaintiff's cable." Atlas I, 2005 WL 1300766, at *7. We went on to note that defendant

willfully violated the Illinois Underground Facilities Damage Prevention Act "when it failed to 'take reasonable action to inform [itself] of the location of any underground utility facilities' (section 50/4(a)) and failed to 'plan the excavation or demolition to avoid or minimize interference with underground utility facilities...within the tolerance zone' (section 50/4(b))." *Id.*, at *8 We went on to explain: "Defendant acted willfully because it knew that it was going to cross plaintiff's cable, but it did not know the depth and precise position of the bore, nor did it know the exact depth and location of the cable, yet it still continued to bore." *Id.*

Although our findings of negligence and violation of a state statute do not, in themselves, lead to a finding that punitive damages are appropriate (Tucker, 597 N.E.2d at 231 (negligence, in itself, is insufficient to find punitive damages appropriate); Overbey v. Illinois Farmers Ins. Co., 525 N.E.2d 1076, 1083-84 (Ill.App.Ct.1988) (punitive damages were not warranted, regardless of recovery under statute)), we find that plaintiff has introduced sufficient evidence to create a genuine issue of material fact to preclude summary judgment. Other courts addressing similar factual situations have found a genuine issue of material fact regarding punitive damages. *See* MCI Worldcom Network Services, Inc. v. Glendale Excavation Corp., 224 F.Supp.2d 875, 881-882 (D.N.J.2002); MCI Worldcom Network Services, Inc. v. Von Behren Elec., Inc., 2002 WL 32166535, *5-6 (N.D.Ga.2002). *Cf.* MCI WorldCom Network Services, Inc. v. W.M. Brode Co., 411 F.Supp.2d 804, 812 (N.D.Ohio 2006) (no punitive damages where plaintiff did not show by clear and convincing evidence that defendant "consciously disregarded the rights and safety of persons," as required under Ohio law).

In this case, plaintiff introduced evidence that Atlas knew its bore would intersect with, and would cross MCI's cable under Entry Drive; defendant knew that the depth of cables can

change under roads; and defendant drilled without knowing the exact depth of plaintiff's cable (plf's additional facts, at ¶¶ 3, 5). Additionally, plaintiff submitted evidence of nine similar incidents since 2001 in which defendant damaged marked underground utilities (plf's additional facts, at ¶ 36). Taken together, such is enough to submit the punitive damages issue to the jury. *See* Rodrian v. Sciber, 551 N.E.2d 772 (Ill.App.Ct.1990) (evidence that defendant crossed over plaintiff's property line prior to obtaining the outcome of the survey of property lines and continued to do so after plaintiff advised defendant of the trespass was sufficient to submit the question of punitive damages to the jury); Roark v. Musgrave, 355 N.E.2d 91, 96 (Ill.App.Ct.1976) ("defendant's failure to make any real attempt to ascertain the boundaries of the property from which he was to cut trees" was sufficient evidence to justify an award of punitive damages for trespass). Like the plaintiffs in Glendale Excavation and Von Behren, plaintiff here will face an uphill battle in receiving punitive damages, and we will revisit the issue if the case goes to trial. Based on the evidence before us, we will not, however, foreclose that opportunity at this stage.

## CONCLUSION

For the reasons stated herein, we grant plaintiff's motions to strike and deny defendant's motion for partial summary judgment.

_James B. Moran_

JAMES B. MORAN

Senior Judge, U. S. District Court

_Dec. 6_ , 2006.